**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 17 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

GEORGE FINBAR ROSS,

      Petitioner-Appellant,

v.

UNITED STATES MARSHAL for the
Eastern District of Oklahoma,

      Respondent-Appellee.

No. 98-7083

---

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CV-98-189-B)**

---

Neal A. Goldfarb (Thomas Earl Patton of Tighe, Patton, Tabackman & Babbin,
L.L.C., Washington, D.C.; Mark Green, Muskogee, Oklahoma, with him on the
briefs), of Tighe, Patton, Tabackman & Babbin, L.L.C., Washington, D.C., for
Petitioner-Appellant.

Sean Connelly (Bruce Green, United States Attorney for the Eastern District of
Oklahoma, Muskogee, Oklahoma; Sara Criscitelly, Department of Justice,
Washington, D.C., on the brief), Assistant United States Attorney, Denver,
Colorado, for Respondent-Appellee.

---

Before **BRORBY, BARRETT** and **EBEL**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

The Government of Northern Ireland, United Kingdom issued warrants for the arrest of Appellant, George Finbar Ross, for forty-one charged offenses stemming from Mr. Ross' alleged involvement in a fraudulent investment scheme. The United States subsequently arrested Mr. Ross pursuant to an extradition treaty existing between the United States and the United Kingdom. After a magistrate judge certified his extradition, Mr. Ross filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 challenging his extradition. The district court denied the petition and Mr. Ross filed this appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 2253 and we affirm.

## I. Background

In 1976, Mr. Ross, a then citizen of the Republic of Ireland, established an offshore investment company in Gibraltar called International Investment Limited ("International Investment"). Mr. Ross was beneficial owner of International Investment and ran the day-to-day operations of International Investment's Dublin office. Over a several-year period, International Investment solicited millions of dollars from investors, primarily in Northern Ireland. International Investment purported to invest the depositors' money in several funds and promised high rates of tax-free interest. However, investigators from Northern Ireland concluded International Investment actually used depositors' funds to

make unsecured loans to Mr. Ross and to related companies set up by Mr. Ross. Among other things, Mr. Ross used International Investment funds to build a home and purchase artwork.

An International Investment auditor first expressed concern over International Investment's financial viability around 1980 or 1981. However, limited access to records and unprofessionally kept books thwarted various attempts to perform a full audit. Gibraltar banking officials also had little success in obtaining audited accounts from either International Investment or Mr. Ross, as required by 1982 changes to Gibraltar banking regulations. A former International Investment employee estimated that by 1982, International Investment was using depositors' investments to pay interest to previous investors. Liquidators would later conclude International Investment was insolvent by mid-1982.

In late October 1983, Mr. Ross moved his residence from the Republic of Ireland to the United States. Mr. Ross visited Northern Ireland in December 1983 to conduct a seminar for International Investment brokers and depositors. At that seminar, Mr. Ross encouraged depositors to make further investments and emphasized International Investment's financial strength even though

International Investment was in fact insolvent and had been for approximately eighteen months. In February 1984, Mr. Ross again returned to Northern Ireland and reassured a group of concerned brokers that while International Investment had a cash flow problem, the company's investments were sound. International Investment went into liquidation on June 14, 1984. Although International Investment owed approximately $7,750,000 to depositors, liquidators were unable to realize any International Investment assets for distribution to them.

The Royal Ulster Constabulary commenced an investigation into International Investment's affairs in 1985, and on June 28, 1996 and February 27, 1997, Northern Ireland officials issued warrants for Mr. Ross' arrest. The warrants charged Mr. Ross with fraudulent conduct occurring between December 1983 and March 1984. United States officials arrested Mr. Ross on March 4, 1998, and Northern Ireland immediately requested extradition pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, Oct. 21, 1976, U.S.-U.K., 28 U.S.T. 227 ("Extradition Treaty"). A magistrate certified Mr. Ross' extradition and ordered him held in custody pending surrender to Northern Ireland. Mr. Ross filed a petition for writ of habeas corpus, arguing his confinement violates the Extradition Treaty. After reviewing the magistrate's

findings and conclusions, the district court denied Mr. Ross' petition.

## II. Extradition

The scope of review of a magistrate judge's extradition order under a treaty with a foreign country is limited to "determining whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal construction, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Peters v. Egnor*, 888 F.2d 713, 716 (10th Cir. 1989) (quotation marks and citation omitted). In this case, Mr. Ross does not contest the magistrate's jurisdiction nor challenge the evidence of his guilt. Rather, he argues the offenses charged are not within the treaty because: (1) the charges are time-barred under the relevant statute of limitations, and (2) the warrants charging Mr. Ross with "false accounting" do not meet the dual criminality requirement.

## 1. Statute of Limitations

Article V of the Extradition Treaty provides extradition shall not be granted if the prosecution has become time-barred according to the law of either the requesting or requested country. Extradition Treaty, 28 U.S.T. at 230. No Northern Ireland statute of limitations applies to Mr. Ross' charges. The

applicable United States law provides for a five-year statute of limitations. 18 U.S.C. § 3282. The statute may be tolled, however, if the accused is a fugitive "fleeing from justice." 18 U.S.C. § 3290.

In this case, Northern Ireland seeks extradition based on charges brought approximately twelve years after Mr. Ross committed the alleged offenses – well beyond the statutory limit. However, the district court concluded the statute tolled because Mr. Ross was fleeing from justice when he moved to the United States in October 1983. In relevant part, the court concluded (1) in order to toll the statute, the government had to prove by a preponderance of the evidence that Mr. Ross had an intent to avoid prosecution or arrest, and (2) the record supported the magistrate's finding that Mr. Ross knew he was likely to be charged with a crime when he moved to the United States and therefore acted with the intent to avoid an anticipated prosecution. Mr. Ross argues the evidence does not support this conclusion because at the time he moved, North Ireland officials had not commenced an investigation nor charged him with any crime. Moreover, Mr. Ross argues he could not have been trying to avoid prosecution for the charges which underlie the extradition request because conduct he is charged with occurred after he moved. We review the district court's interpretation of the tolling statute *de novo*; *United States v. Morgan,* 922 F.2d 1495, 1496 (10th Cir.),

-6-

*cert. denied*, 501 U.S. 1207 (1991), and the court's determination Mr. Ross was fleeing from justice for clear error. *United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998); *United States v. Marshall*, 856 F.2d 896, 900-01 (7th Cir. 1988).

As a preliminary matter, we must first determine what constitutes "fleeing from justice" under the statute. The circuit courts are currently split on the issue. A small minority of circuits have held mere absence from the jurisdiction in which the crime was committed is enough to toll the statute. *In re Assarsson*, 687 F.2d 1157, 1162 (8th Cir. 1982); *McGowen v. United States*, 105 F.2d 791, 792 (D.C. Cir. 1939). The district court, on the other hand, adopted the majority view, which requires the prosecution to prove the accused had an intent to avoid arrest or prosecution. *See Greever*, 134 F.3d at 780; *United States v. Rivera-Ventura*, 72 F.3d 277, 283 (2d Cir. 1995); *United States v. Fonseca-Machado*, 53 F.3d 1242, 1244 (11th Cir.), *cert. denied*, 516 U.S. 925 (1995); *United States v. Marshall*, 856 F.2d 896, 900 (7th Cir. 1988); *United States v. Gonsalves*, 675 F.2d 1050, 1052 (9th Cir.), *cert. denied*, 459 U.S. 837 (1982); *Donnell v. United States*, 229 F.2d 560, 565 (5th Cir. 1956); *Brouse v. United States*, 68 F.2d 294, 295 (1st Cir. 1933). The Supreme Court has not squarely addressed the issue. However, in considering the predecessor to 18 U.S.C. § 3290, the Court in *Streep v. United States*, 160 U.S. 128 (1895) implicitly recognized intent as an element

of fleeing from justice, *id.* at 133 ("In order to constitute a fleeing from justice ... [i]t is sufficient that there is a flight with the intention of avoiding being prosecuted.")  Consistent with *Streep*, we conclude "fleeing from justice" requires the government to prove, by a preponderance of the evidence, the accused acted with the intent to avoid arrest or prosecution.[1]

Having thus determined the appropriate standard of proof, we must decide whether the district court committed clear error in finding Mr. Ross had the requisite intent to flee arrest or prosecution when he moved to the United States. We believe the record supports the district court's conclusion.  By October 1983, the investigatory record indicates Mr. Ross was aware of the International Investment's ongoing fraudulent scheme – he knew International Investment used investors' money to make multiple unsecured loans for his benefit and to pay interest to previous investors.  Mr. Ross also likely knew International Investment was insolvent or rapidly approaching insolvency, and that International

---

[1]  We note this interpretation is not entirely without precedent in this circuit.  In 1873, the Circuit Court of Kansas, a predecessor to this court, came to a similar conclusion when it held fleeing from justice meant "to leave one's home or residence or known place of abode, with intent to avoid detection or punishment." *United States v. O'Brian*, 27 F. Cas. 212, 213 (C.C. Kan. 1873) (No. 15,908).  Congress replaced the circuit courts with the current United States Courts of Appeals in 1891.  *See generally* Erwin Chemerinsky, Federal Jurisdiction 23-25 (2d ed. 1994).

Investment would soon have to submit to a full audit to maintain its Gibraltar banking license, thereby revealing the fraudulent scheme. Based on this evidence, it was not clearly erroneous for the district court to infer Mr. Ross' intent to flee arrest or prosecution.[2]

The fact that Northern Ireland had not yet initiated its investigation does not change this conclusion. An accused may form the requisite intent even though prosecution has not actually begun. *See Streep*, 160 U.S. at 133 ("It is sufficient that there is a flight with the intention of avoiding being prosecuted, whether a prosecution has or has not been actually begun."); *United States v. Ballesteros-Cordova*, 586 F.2d 1321, 1323 (9th Cir. 1978) ("The statute of limitations will be tolled whenever the suspect flees with the intent of avoiding prosecution, even if prosecution has not actually begun at the time of the flight."). In other words, an intent to avoid an *anticipated* arrest or prosecution is sufficient

---

[2] We realize the district court's opinion relies in part on conduct that occurred *after* Mr. Ross moved to the United States – specifically statements made to investors in December 1983 and February 1984. While we acknowledge the limited relevance of this conduct, we nevertheless find sufficient pre-October 1983 evidence to support the district court's finding. *See Seibert v. Oklahoma*, 867 F.2d 591, 597 (10th Cir. 1989) ("An appellate court may affirm the judgment of a district court on any grounds that find support in the record, provided the litigants have had a fair opportunity to develop the record.")

to toll the statute.[3]

We likewise reject Mr. Ross' argument that he did not have the intent to avoid prosecution because the charged conduct occurred after he moved. A prosecutor's decision as to which charges to file is a matter of discretion and involves consideration of many factors. *See generally Wayte v. United States*, 470 U.S. 598, 607 (1985) (listing factors which affect prosecutorial discretion such as strength of the case, deterrence value, and enforcement priorities); *United States v. Zabawa*, 39 F.3d 279, 284 (10th Cir. 1994) (recognizing prosecutor discretion to choose which crimes of any given criminal to prosecute). We fail to see how this decision-making process limited or restricted Mr. Ross' intent to flee prosecution in October 1983. More important, the record indicates Mr. Ross was aware of the potential criminality of his conduct and its imminent discovery in October 1983. Because this evidence forms a sufficient basis from which to infer Mr. Ross' intent to avoid an anticipated prosecution, we conclude the district

---

[3] As the government correctly points out, it makes no difference that Mr. Ross moved to the United States from the *Republic of Ireland* rather than *Northern Ireland,* the country seeking extradition. The government need not prove Mr. Ross had the intent to flee a particular court system or state. *Streep*, 160 U.S. at 134-35. It is enough that the accused has "an intent to avoid the justice of the state having criminal jurisdiction over the same territory and the same act." *Id.* at 135.

court's determination was not clearly erroneous.[4]

## 2. Dual Criminality

Under Article III of the Extradition Treaty, an offense must meet the dual criminality requirement in order to be extraditable. Extradition Treaty, 28 U.S.T. at 229. The doctrine of dual criminality requires the offense with which the accused is charged to be "punishable as a serious crime in both the requesting and requested states." *Peters*, 888 F.2d at 718 (quotation marks and citation omitted). To satisfy the dual criminality requirement, the requesting and requested countries' statutes must be substantially analogous or "punish conduct falling within the broad scope of the same generally recognized crime." *Id.* at 719 (quotation marks and citation omitted).

The magistrate concluded the offenses listed in Mr. Ross' extradition

---

[4] Mr. Ross argues he had legitimate, business-related reasons for moving and notes he has lived openly in the United States since he moved. However, it was within the district court's discretion to weigh this evidence. *Federal Deposit Ins. Corp. v. Hamilton*, 122 F.3d 854, 860 (10th Cir. 1997). Because we find the district court's finding permissible in light of the entire record, we uphold the court's determination regarding Mr. Ross' intent. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.")

request met the dual criminality requirement. Specifically, the magistrate determined Mr. Ross' alleged conduct is criminal under the United States statutes prohibiting mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, and the Oklahoma false pretenses statute; Okla. Stat. tit. 21, §1541.2. Mr. Ross argues the warrants charging him with "false accounting" do not meet the duality requirement.[5] The issue of whether dual criminality is satisfied is a legal question we review *de novo*. *Peters*, 888 F.2d at 718.

Warrants six through forty-one charge Mr. Ross with violating § 17(1)(b) of the Theft Act (Northern Ireland) of 1969 which makes it a crime for one to produce or make use of a misleading, false or deceptive account or other

---

[5] Although Mr. Ross did not specifically address the dual criminality issue in his habeas petition, he argues he adequately preserved the issue because his petition incorporated by reference all arguments made in proceedings before the magistrate. As a general rule, we will not consider an issue not "presented to, considered [and] decided by the trial court." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (quotation marks and citation omitted). However, we retain discretion to consider issues for the first time on appeal based on the facts of the individual case. *Lyons*, 994 F.2d at 721 (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)). Here, it is debatable whether Mr. Ross adequately raised the issue in front of the district court. *See Lyons*, 994 F.2d at 721 ("[V]ague, arguable references to [a] point in the district court proceedings do not preserve the issue on appeal." (Quotation marks and citation omitted).). Assuming he did not, we nevertheless exercise our discretion to hear the dual criminality issue because it is purely a matter of law; *see Stahmann Farms, Inc. v. United States*, 624 F.2d 958, 961 (10th Cir. 1980), and because its proper resolution is certain; *see Singleton*, 428 U.S. at 121.

document made for accounting purposes, "with a view to gain for himself or another or with intent to cause loss to another." Mr. Ross argues this section of the Theft Act is not substantially analogous to the federal mail and wire fraud statutes because those statutes, unlike the Theft Act, require proof the defendant carried out a fraudulent scheme through use of the mails or wire transmissions. We disagree. The Theft Act and the mail and wire fraud statutes proscribe the same basic conduct–use of false representations to defraud or obtain property. *See United States v. Sensi*, 879 F.2d 888, 893 (D.C. Cir. 1989) (concluding offense underlying both the Theft Act and mail fraud statue was stealing); *United States v. Herbage*, 850 F.2d 1463, 1466 (11th Cir. 1988) (finding dual criminality between Theft Act and mail fraud statute), *cert. denied*, 489 U.S. 1027 (1989). The element requiring use of the mails or interstate wire transmission is merely a jurisdictional requirement which makes the underlying crime federal in nature. *Sensi*, 879 F.2d at 893; *Herbage*, 850 F.2d at 1466; *Emami v. United States Dist. Court*, 834 F.2d 1444, 1450 (9th Cir. 1987). The criminal conduct each statute proscribes remains substantially analogous, thus satisfying the dual criminality requirement.[6] *Peters*, 888 F.2d at 719-20.

---

[6] Because we conclude duality exists between the Theft Act and the mail and wire fraud statutes, we need not address the parties' arguments regarding the Oklahoma false pretenses statute.

The judgment of the district court is **AFFIRMED**.