**UNITED STATES COURT OF APPEALS**
**Tenth Circuit**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-3157**

Patrick J. Fisher, Jr.                                                    Elisabeth A. Shumaker
        Clerk                                                                  Chief Deputy Clerk

August 25, 2000


**TO:**  ALL RECIPIENTS OF THE OPINION

**RE:**  Nos. 99-4067, 99-4090, *Proctor & Gamble Co., et al. v. Haugen, et al.*
       2000 WL 1199076
       Filed on August 23, 2000


The court's slip opinion filed on August 23, 2000 contained bold typeface citations to the record, which were not intended to be included in the published opinion. A corrected copy of the opinion is attached.

Sincerely,

Patrick Fisher, Clerk of Court


By:   Keith Nelson
      Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 23 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

THE PROCTOR & GAMBLE
COMPANY; PROCTOR & GAMBLE
DISTRIBUTING COMPANY,

  Plaintiffs - Appellants and
  Cross-Appellees,

v.

RANDY L. HAUGEN, individually,
doing business as Freedom Associates,
Inc.; FREEDOM TOOLS
INCORPORATED; FREEDOM
ASSOCIATES, INC., a Utah
corporation; STEVEN E. BRADY,
individually; STEPHEN L. BYBEE,
individually; EAGLE BUSINESS
DEVELOPMENT, INC., a Utah
corporation; TED RANDALL
WALKER, individually; WALKER
INTERNATIONAL NETWORK, a
Texas Partnership; ROGER D.
PATTON, individually,

  Defendants - Appellees,

and

AMWAY CORPORATION, a
Michigan corporation,

  Defendant - Appellee and
  Cross-Appellant,

and

Nos. 99-4067
99-4090

JEFFREY G. MUSGROVE,
individually; MUSGROVE
ENTERPRISES, a Texas partnership,

Defendants.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CV-94-K)**

---

Neil Peck (Thomas S. Nichols, Andrew M. Low, Martin J. Katz, Gale T. Miller, Kenzo S. Kawanabe and Shana M. Solomon with him on the briefs) of Davis, Graham & Stubbs, LLP, Denver, Colorado, for Plaintiffs - Appellants and Cross-Appellees.

James R. Sobieraj, Brinks Hofer Gilson & Lione, Chicago, Illinois (Cynthia A. Homan, Timothy Q. Delaney and Dominic P. Zanfardino of Brinks Hofer Gilson & Lione, Chicago, Illinois; Joseph J. Joyce and Kirstin A. Van Orman of Strong & Hanni, Salt Lake City, Utah, with him on the brief) for Defendants - Appellees and Cross-Appellant.

---

Before **LUCERO**, **McKAY** and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

The Proctor & Gamble Company and Proctor & Gamble Distributing Company ("P&G") appeal from a final judgment dismissing their lawsuit against parties who disseminated the rumor that P&G is a corporate agent of Satan. We decide whether the district court erred in granting summary judgment on P&G's

Lanham Act claim on the ground that the message—associating P&G with Lucifer—does not relate to qualities or characteristics of P&G's products and hence falls outside the ambit of the Lanham Act. We also decide whether the district court properly dismissed for failure to state a claim and granted summary judgment as to P&G's Utah state tort claims, also arising out of the disseminated message linking P&G to Diabolus. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I

The corporate butt of the Beelzebub canard in this case, P&G, is the manufacturer and distributor of numerous products for personal care, household use, and consumption.[1] Defendant-appellee Amway Corporation ("Amway")

---

[1] What follows are facts which are either uncontroverted, taken as true for purposes of the motion to dismiss under Fed. R. Civ. P. 12(b)(6), or as to which there is no genuine issue of material fact for summary judgment purposes under Fed. R. Civ. P. 56(c). The majority of the record in this case was sealed and declared confidential pursuant to a protective order entered by the district court below under Fed. R. Civ. P. 26(c)(7), a protective order to which the parties stipulated. See P&G v. Haugen, No. 95-CV-0094W (D. Utah Nov. 15, 1996) (protective order). The Supreme Court has noted that a state rule patterned after Rule 26(c) "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984); see also Centurion Indus., Inc. v. Warren Steurer & Assoc., 665 F.2d 323, 326 (10th Cir. 1981) ("It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure. Likewise, if the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial

(continued...)

- 3 -

likewise sells numerous consumer products, including detergents, cosmetics, nutrition supplements, housewares, and cleaning agents—some in direct competition with P&G's products—as well as the brand-name products of third-party companies. Amway sells through a network of distributors, who in turn sell the products to other distributors and consumers.

The relationships between Amway and its distributors and between the distributors themselves bear some explanation. Amway's distribution system consists of more than a million distributors around the world. It sells its products to distributors who, in addition to selling directly to consumers, sell to and recruit further distributors, who in turn follow suit—in a cycle that replicates itself. There is record evidence that Amway distributors are responsible for inspiring and encouraging distributors to whom they sell, who in turn are encouraged to emulate those above them in the Amway distribution hierarchy. Although Amway distributors are strongly encouraged to purchase, distribute, and consume Amway products, they may also purchase and consume P&G products.

---

[1](...continued)
court's discretion."). We therefore would be hard-pressed to question the district court's judgment or to decide what materials (aside from the published materials and materials patently unrelated to trade secrets) in the sealed record before us do not constitute trade secrets and can be revealed in our published opinion. We err on the side of caution and do not disclose any information that is not clearly of a public nature, as a result of which we do not discuss certain details of the factual basis underlying the disposition of certain claims in this appeal.

To facilitate communication between its distributors, Amway sells them a communication system known as AmVox. Using AmVox, Amway and its distributors have the ability to send messages to, and receive messages from, other Amway distributors who subscribe to AmVox.

Defendant-appellee Randy L. Haugen is a distributor of Amway products and a developer of Amway business in the Amway distribution chain. At the time this action was commenced, Haugen had established a network of an estimated 100,000 distributors of Amway products throughout Utah, Nevada, Texas, Mexico, and Canada and served on the Amway Distributors Association Council—an advisory and consultative body for Amway. Freedom Associates, Inc., Freedom Tools Inc., Roger D. Patton, Steven E. Brady, Stephen L. Bybee, Eagle Business Development, Inc., Ted Randall Walker, and Walker International Network (hereinafter "the distributor appellees") are Amway distributors in Haugen's distribution network. Using AmVox, Haugen is capable of distributing any message to 25,000-30,000 of the distributors beneath him in the Amway hierarchy.

In April 1995, defendant-appellee Haugen posted the following message ("the subject message") on AmVox after receiving the message from other Amway distributors:

> I wanna run something by you real quick that I think you will find
> pretty interesting. Just talking to a guy the other night about this

very subject and it just so happens that a guy brings information in and lays it on my desk this morning, so here it goes.

It says the president of Procter & Gamble appeared on the Phil Donahue Show on March 1, '95. He announced that due to the openness of our society, he was coming out of the closet about his association with the church of satan. He stated that a large portion of the profits from [P&G] products go to support his satanic church. When asked by Donahue if stating this on television would hurt his business, his reply was, "There are not enough Christians in the United States to make a difference." And below it has a list of the [P&G] products which I'll read: [the subject message then lists 43 P&G products].

It says if you are not sure about a product, look for the symbol of the ram's horn that will appear on each product beginning in April. The ram's horn will form the 666 which is known as satan's number. I'll tell you it really makes you count your blessings to have available to all of us a business that allows us to buy all the products that we want from our own shelf and I guess my real question is, if people aren't being loyal to themselves and buying from their own business, then whose business are they supporting and who are they buying from. Love you. Talk to you later. Bye.

(I Appellants' App. at 124-25.) Although it is unclear from the record how many distributors the subject message reached, it was spread via AmVox among at least two groups of distributors. The record is replete with evidence that P&G received complaints and inquiries from a large number of individuals regarding similar allegations of affiliation with Satan that were disseminated by leaflet and otherwise, but not primarily through the subject message.

After learning of the subject message, an Amway representative called Haugen, suggesting he post a retraction of the message designed to reach those

- 6 -

distributors who had received it. Amway also delivered to Haugen a copy of a P&G information package explaining the falsity of rumors of P&G's conspiracy with Satan. Prior to his conversation with Amway, Haugen had posted a tentative retraction on AmVox describing the subject message as unsubstantiated. On April 26, 1995, after his conversation with Amway, Haugen again posted a retraction on AmVox stating:

> It was rumored that on a television show (on the Phil Donahue) and it is rumored on other talk shows, that CEO or officers from [P&G] went on to the show and told them that their symbol represented Satanism symbol on all of their products and also that they practice Satanism. I'm going to read you a statement here and see if we can get this rumor, put it out, because I know a lot of you would like to know the truth. And it's very important that you understand this.

(I Appellants' App. at 224.) Haugen's retraction went on to categorically deny the allegation of an affiliation between P&G and the Evil One. One or both of the retractions were sent to Haugen's entire distribution network, though the number of people receiving the retraction is unclear from the record. The subject message continued to circulate on Amvox after the retractions.

The subject message was not the first such missive regarding the Lucifer-P&G connection circulated by Amway distributors. Rumors of such a fiendish relation—some spread by Amway distributors—have been prevalent for nearly twenty years, dogging P&G despite its attempts to eliminate them through both public relations and litigation.

On August 28, 1995, P&G filed suit in United States District Court for the District of Utah against Haugen, the distributor appellees, and Amway, claiming that as a result of the subject message and other similar missives disseminated by defendants, P&G lost customers concerned about supporting Satan through their purchase of P&G's products.[2]  The district court granted summary judgment to Haugen on P&G's Lanham Act and Utah state slander per se and vicarious liability claims and dismissed under Fed. R. Civ. P. 12(b)(6) P&G's state claims of tortious interference with business relationships and unfair competition.  This appeal followed.[3]

We turn first to the district court's grant of summary judgment on P&G's Lanham Act and Utah state tort claims, respectively, and then consider the court's 12(b)(6) dismissal of the remaining Utah state tort claims.

**II**

---

[2]  Contrary to appellees' assertion, the district court limited P&G's complaint to allegations of Satanism rumors generally, not to the subject message alone, but prohibited the addition of claims concerning unrelated misrepresentations of the "qualities and ingredients" of specific P&G products. (IV Appellants' App. at 2103.)  However, because P&G limits its Lanham Act arguments on appeal to the subject message, we likewise limit our analysis to that message.

[3]  Amway filed timely notice of cross-appeal from the dismissal of its cross-claims, but did not pursue the cross-appeal.  P&G did not appeal from the dismissal of negligent supervision and Utah Truth in Advertising Act claims.

We review de novo the district court's grant of summary judgment. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

**A**

As a general matter, the Lanham Act, 15 U.S.C. §§ 1051 et seq., "protect[s] persons engaged in . . . commerce against unfair competition . . . ." 15 U.S.C. § 1127. Section 43(a) of the Act, as amended, provides in relevant part that:

> Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any . . . false or misleading representation of fact which . . . in commercial advertising or promotion misrepresents the nature, characteristics, [or] qualities . . . of . . . another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

The district court granted defendants-appellees' motion for summary judgment on P&G's Lanham Act claim because it found the subject message, although "identif[ying] . . . [P&G] products," did not "contain false representations about the qualities or characteristics of those products," and so

did "not relate to a product within the meaning of the Lanham Act." P&G v. Haugen, No. 1:95 CV 0094K, at 3 (D. Utah Sept. 4, 1998) (order).[4] We agree with the district court that the subject message did not implicate the nature, characteristics, or qualities of P&G's products because it impugned no feature of the products themselves, such as price, see B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 857 F. Supp. 1241, 1246 (N.D. Ill. 1994), regulatory approval, see Cottrell, Ltd. v. Biotrol Int'l, Inc., 191 F.3d 1248, 1255-56 (10th Cir. 1999), scope of copyright, see American Broad. Co. v. Maljack Prods., Inc., 34 F. Supp.2d 665, 678 (N.D. Ill. 1998), or substitutability for another product, see Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 516 (8th Cir. 1996).[5]

However, in addition to challenging on appeal the district court's conclusion that there was no genuine issue as to misrepresentation of the qualities or characteristics of its goods or services, P&G argues that the district court erred in granting summary judgment because the subject message's representations

_____

[4] Insofar as the district court and P&G use the term "products" in the context of § 43(a)(1)(B) of the Lanham Act, we construe those references as referring to "goods" or "services" under that provision.

[5] The subject message's representations that the ram's horn forming the number 666 would appear at some future time on P&G products in no way implicates P&G's prior "moon and stars" trademark and therefore raises no genuine issue as to whether an existing attribute of any of P&G's products was involved.

- 10 -

regarding the infernal affiliation of P&G and the use of its profits misrepresented "the nature, characteristics, [or] qualities . . . of . . . [its] <u>commercial activities</u>." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). While P&G properly raised the bulk of its Lanham Act arguments below, appellees correctly point out that P&G did not timely raise the instant argument before the district court. It made a passing reference to a "commercial activities" claim during oral argument, but admitted in its motion for reconsideration that it had directed the court to focus on the Lanham Act terms "goods" or "services" rather than the term "commercial activities." It did not explicitly make the argument until its motion for reconsideration of the district court's grant of summary judgment under Fed. R. Civ. P. 60(b), a motion the court denied as not presenting any of the "exceptional circumstances" warranting relief under that Rule. See <u>Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.</u>, 909 F.2d 1437, 1440 (10th Cir. 1990) (noting that "[r]elief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances").

When an issue has not been properly raised below, "to preserve the integrity of the appellate structure, we should not be considered a 'second-shot' forum . . . where secondary, back-up theories may be mounted for the first time." <u>Tele-Communications, Inc. v. Commissioner</u>, 104 F.3d 1229, 1233 (10th Cir. 1997) (citing <u>Anschutz Land & Livestock Co. v. Union Pac. R.R. Co.</u>, 820 F.2d

338, 344 n.5 (10th Cir. 1987)); see also Burnette v. Dresser Indus., Inc., 849 F.2d 1277, 1285 (10th Cir. 1988) (holding that arguments first raised in a motion for reconsideration and not considered by the trial court would not be addressed on appeal). "We will consider matters not raised or argued in the trial court only in 'the most unusual circumstances,'" as when "public interest is implicated, . . . or manifest injustice would result." Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1386 (10th Cir. 1997) (quoting Rademacher v. Colorado Ass'n of Soil Conservation Dists. Med. Benefit Plan, 11 F.3d 1567, 1572 (10th Cir. 1993)). Where the issue "is purely a matter of law . . . and . . . its proper resolution is certain," however, we may consider it. Ross v. United States Marshall, 168 F.3d 1190, 1195 n.5 (10th Cir. 1999) (citing Stahmann Farms, Inc. v. United States, 624 F.2d 958, 961 (10th Cir. 1980); Singleton v. Wulff, 428 U.S. 106 (1976)); see also Petrini v. Howard, 918 F.2d 1482, 1483 n.4 (10th Cir. 1990) (holding the issue would be considered where proper resolution was beyond doubt and injustice would otherwise result).

In the present case, we are faced with just such an exceptional situation involving a "pure[] matter of law" the "proper resolution" of which is certain. See Ross, 168 F.3d at 1195 n.5. Albeit fostered by the litigants, the district court's approach of focusing on the words "goods" and "services" caused it not to consider the entire statutory clause in which those words appear—and the words

"commercial activities" in particular.  The question here is one of statutory interpretation and thus a pure matter of law: whether the kind of activity alleged in the subject message is properly classified under "commercial activities" for § 43(a)(1)(B) purposes.  That question was thoroughly briefed by the parties and its proper resolution is certain:  Although the district court was correct in holding the subject message did not concern "the nature, characteristics, [or] qualities . . . of [P&G's] goods [or] services," the subject message clearly related to P&G's "commercial activities" under § 43(a)(1)(B) of the Act, 15 U.S.C. § 1125(a)(1)(B).  That result is evident from the language and history of the Lanham Act.  Given the importance of § 43(a) to the proper functioning of this country's competitive commercial markets, that result implicates the public interest.  Cf. Sussman v. Patterson, 108 F.3d 1206, 1210 (10th Cir. 1997) (addressing the proper interpretation of the attorneys' fees and costs provision of 42 U.S.C. § 1983—which had been otherwise waived on appeal—because that question involved a pure legal issue, was fully briefed by the parties, and raised "important public concerns").  We thus elect to consider the issue on the merits.[6]

---

[6]  We note that we are addressing on appeal the district court's grant of summary judgment and not its denial of P&G's motion for reconsideration.

- 13 -

We begin our analysis of the meaning of statutes by examining the relevant statutory language. See Aulston v. United States, 915 F.2d 584, 589 (10th Cir. 1990).

> When the terms of a statute are unambiguous, our inquiry is complete, except in rare and exceptional circumstances. In interpreting the relevant language, however, we look to the provisions of the whole law, and to its object and policy.

Id. (citing Rubin v. United States, 449 U.S. 424, 430 (1981); Dole v. United Steelworkers, 494 U.S. 26 (1990)). Although Congress did not define the term "commercial activities" in the Act, the plain language meaning of that term encompasses "commercial transactions" or all activities surrounding the peculiar "commerce" of a company, defined as "the exchange or buying and selling of commodities." Webster's Third New International Dictionary (Unabridged) 456 (1993).

The subject message linking P&G to Beelzebub clearly concerned the "nature, characteristics, [or] qualities . . . of . . . [P&G's] commercial activities," under the plain meaning of that phrase. In particular, the subject message asserted that "a large portion of the profits from [P&G] products go to support [the church of Satan]." (I Appellants' App. at 124.) Given the common association of Satan and immorality, a direct affiliation with the church of Satan could certainly undermine a corporation's reputation and goodwill by suggesting the corporation conducts its commercial activities in an unethical or immoral

manner.[7] There can be little doubt that products are often marketed and purchased not only on the basis of their inherent utility, but also for the images they project and the values they promote. In that regard, the subject message itself implies that recipients should question the values promoted by the businesses from whom they purchase goods. In light of the foregoing reality of the marketplace, corporations cultivate their images and values through a wide array of activities, including celebrity endorsements, sponsorships, and charitable giving. See Faith Stevelman Kahn, Pandora's Box: Managerial Discretion and the Problem of Corporate Philanthropy, 44 UCLA L. Rev. 579, 665 (1997) ("There is considerable empirical evidence that charitable contributions have been assimilated into corporate marketing and advertising functions, either as a

---

[7] See National Artists Management Co. v. Weaving, 769 F. Supp. 1224, 1229-36 (S.D.N.Y. 1991) (holding actionable under a Lanham Act false advertising claim a defendant's allegations that a competing theater booking agency engaged in improper and unethical practices); cf. Coastal Abstract Serv., Inc. v. First Am. Tit. Ins. Co., 173 F.3d 725, 732 (9th Cir. 1999) (holding actionable under § 43(a)(1)(B) a statement that an escrow agent was not paying his bills); Fuente Cigar, Ltd. v. Opus One, 985 F. Supp. 1448, 1454 (M.D. Fla. 1997) (holding a defendant's statements about the plaintiff's misuse of the defendant's reputation were "plainly statements . . . about . . . commercial activities," even though they were not statements about "goods or services," and therefore were actionable under § 43(a)(1)(B)); H & R Indus., Inc. v. Kirshner, 899 F. Supp. 995, 1005-06 (E.D.N.Y. 1995) (holding actionable under § 43(a)(1)(B) a representation that the plaintiff used improper methods of soliciting customers).

complement to or as a substitute therefor." (footnotes omitted)). Allegations that P&G tithes the church of Satan concern just such commercial activities.

That conclusion is reinforced by an examination of the Act's "object and policy," as evidenced by its language and legislative history. Aulston, 915 F.2d at 589. As a general matter, the drafters and promoters of the original Lanham Trademark Act of 1946, ch. 540, 60 Stat. 427 (1946), sought to create a general federal law of unfair competition to protect competing companies in the wake of the Supreme Court's decision in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), which was thought to have eliminated the existing body of federal unfair competition law. See Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 873 (10th Cir. 1995) ("A false advertising claim implicates the Lanham Act's purpose of preventing unfair competition." (citing 15 U.S.C. § 1127)); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 27:7 (1999).

In 1988 Congress amended the Act. See Trademark Law Revision Act of 1988, Pub. L. No. 100-667, tit. I, § 132, 102 Stat. 3935. Of greatest relevance to our present inquiry is the amendment's addition of "commercial activities" to the original coverage of the provision, which until then had been applicable exclusively to "goods or services." Id.[8] The legislative history of the 1988

---

[8] The original version of § 43(a) provided in relevant part as follows:

(continued...)

- 16 -

amendments is scant, <u>see</u> Jean Wegman Burns, <u>Confused Jurisprudence: False Advertising Under the Lanham Act</u>, 79 B.U. L. Rev. 807, 820-21 (1999), though as a general matter they were intended to codify existing case law, <u>see</u> <u>Vornado Air Circulation Sys. Inc. v. Duracraft Corp.</u>, 58 F.3d 1498, 1505-06 (10th Cir. 1995). However, the amendments also overruled aspects of existing law, most significantly by covering trade libel or product disparagement (i.e., misrepresentations about the plaintiff's goods and services) and by permitting actions based on misrepresentations about commercial activities as well as goods and services. <u>See</u> Burns, 79 B.U. L. Rev. at 821. The latter addition indicates that the term "commercial activities" was intended to denote something other than mere "goods or services." <u>See</u> <u>Bridger Coal Co./Pac. Minerals, Inc. v. Director, Office of Workers' Compensation Programs</u>, 927 F.2d 1150, 1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.").

---

[8](...continued)
Any person who shall affix, apply, or annex, or use in connection with any goods or services, or . . . containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same . . . shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin . . . or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Lanham Trademark Act of 1946, ch. 540, tit. VIII, § 43, 60 Stat. 427.

It is therefore apparent, in the context of the Act's broad purpose of proscribing unfair competition and the 1988 amendment of § 43(a), that Congress did not intend to narrowly limit the term "commercial activities," but rather intended to encompass those activities which do not solely involve the provision of services or the production of goods. Properly construed, the term "commercial activities" in § 43(a) encompasses P&G's use of the profits from the sale of its goods. The district court's grant of summary judgment to defendants-appellees on the ground that the subject message did not directly implicate "goods" or "services" was improvident because P&G has shown a genuine issue of material fact exists as to whether the subject message is actionable under the "commercial activities" prong of § 43(a)(1)(B).

## B

In addition to the grounds on which the district court relied in granting summary judgment, appellees, in support of their motion for summary judgment and in their appellate brief, raise the argument that the subject message is not "commercial advertising or promotion" for purposes of § 43(a)(1)(B) liability; specifically, appellees argue that whatever advertising or promotion there was in this case was not "commercial speech" and therefore was not actionable under the Lanham Act. Although the district court did not rely on that ground for granting summary judgment to defendants-appellees, we must address any alternative

- 18 -

ground for affirmance that appellees have properly preserved below and raised on appeal and for which there is a sufficient record. See Tinkler v. United States, 982 F.2d 1456, 1461 n.4 (10th Cir. 1992). We therefore turn now to that alternative ground.

We find Gordon & Breach Science Publishers, S.A. v. American Institute of Physics, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994), helpful in framing the question of whether the representations constitute "commercial advertising or promotion" under § 43(a)(1)(B). In Gordon & Breach, the court set out the following four-part test, which we adopt:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

859 F. Supp. at 1535-36; see also Coastal Abstract Serv., Inc. v. First Am. Tit. Ins. Co., 173 F.3d 725, 734 (9th Cir. 1999) (adopting the same test); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996) (same). In the present case, appellees effectively raise only P&G's failure to fulfill the first element of the four-prong test as grounds for affirmance, and it is that element which we

- 19 -

examine here.[9] In so doing, we hold—as the parties implicitly assumed in their briefs on appeal—that the meaning of "commercial speech" in the context of § 43(a)(1)(B) of the Lanham Act tracks the First Amendment "commercial speech" doctrine.  See Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120-21 (8th Cir. 1999); Seven-Up Co., 86 F.3d at 1383 n.6; Oxycal Labs., Inc. v. Jeffers, 909 F. Supp. 719, 722-723 (S.D. Cal. 1995); Gordon & Breach, 859 F. Supp. at 1536 ("Congress intended Section 43(a) to extend only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court." (internal quotations omitted)); cf. Semco, Inc.

_____

[9] On appeal, defendants-appellees raise an argument they did not raise in the summary judgment motion before the district court.  They argue, with respect to the fourth element of the test for "commercial advertising or promotion" under § 43(a)(1)(B), that the subject message was "circulated informally among a few distributors on a private voicemail system" and cite case law for the proposition that it therefore was not disseminated sufficiently "within the consumer goods industry."  (Appellees' Br. at 37 (citing Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp.2d 570, 577 (1999); Fashion Boutique of Short Hills v. Fendi USA, Inc., 942 F. Supp. 209, 216 (S.D.N.Y. 1996)).)  This argument is not a pure matter of law the resolution of which is certain, see Ross, 168 F.3d at 1195 n.8, but rather involves a difficult factual determination as to the number and identity of those individuals reached by the subject message.  Thus, unlike the "commercial activities" claim that we reached despite waiver below, the instant claim is not one that we may properly reach.  See id.  Furthermore, there is a genuine issue of material fact as to the fourth element of a showing of "commercial advertisement or promotion" due to the uncertainty as to the number of Amway distributors—part of the "relevant purchasing public" in this case—actually reached by the subject message.  Gordon & Breach, 859 F. Supp. at 1536.

v. Amcast, Inc., 52 F.3d 108, 111 (6th Cir. 1995) (finding the legislative history of § 43(a)(1)(B) ambiguous with regard to the meaning of "commercial speech").

While commercial speech jurisprudence is not remarkable for its clarity, the Supreme Court has enunciated certain principles with some consistency in drawing "the 'common-sense' distinction between speech proposing a commercial transaction . . . and other varieties of speech." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 455-56 (1978) (quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 n.24 (1976)).  To begin with, a representation is not necessarily commercial speech merely because—by way of example—it is contained in an advertisement, made with an economic motive, or refers to a specific product, although the combination of those characteristics strongly supports classification as commercial speech.  See Bolger v. Youngs Drug Prods. Corp., 463 US. 60, 66 (1983); see also City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 420-21 (1993) (noting the fact that a representation is contained in an advertisement is insufficient to strip that representation of the protections of the First Amendment).  Rather, the difference between commercial speech and noncommercial speech "is a matter of degree." Discovery Network, 507 U.S. at 423.

In a case involving a company's informational pamphlets on its contraceptive products, the Supreme Court "made clear that advertising which

'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech," despite "the fact that [the pamphlets] contain discussions of important public issues." Bolger, 463 U.S. at 67-68 (quoting Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 563 n.5 (1980)). Although the pamphlets could not "be characterized merely as proposals to engage in commercial transactions" and contained noncommercial speech, thus taking them out of the realm of the "core notion of commercial speech," on balance they nonetheless constituted commercial speech. Id. at 66-68 (citations omitted). In so holding, the Court emphasized that "[a] company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." Id. at 68 (footnote and citation omitted). Similarly, in Board of Trustees of the State University of New York v. Fox, 492 U.S. 469, 474 (1989), the Court held that a "noncommercial" representation about household efficiency was not "inextricably intertwined" with a commercial message associated with selling housewares, and therefore the speech could be classified as "commercial." See also U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 937 (3d Cir. 1990) (holding that although healthcare advertising campaigns contained significant information on "important and debated issues," the advertisements at

issue nonetheless constituted "commercial speech"); cf. Central Hudson, 447 U.S. at 562 & n.5 (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience," but proceeding to include within that definition certain advertising linking a product to a current public debate (citations omitted)).

In the present case, we are likewise dealing with a message containing both a noncommercial, "theological" component and a commercial component. As Bolger and Fox indicate, however, the bare fact that the subject message contains a "theological" component is insufficient to transform it into noncommercial speech. If appellees had argued that a significant theological, political, or other noncommercial purpose underlay the subject message, the message might be accorded the substantially greater First Amendment protections enjoyed by "core" religious speech and the other varieties of noncommercial First Amendment speech such as political speech. See, e.g., Pleasant v. Lovell, 876 F.2d 787, 795 (10th Cir. 1989) (holding "that the presence of some commercial activity does not change the standard of first amendment review" where the organization engaged in such activity had a clear political purpose (citing In re Grand Jury Proceeding, 842 F.2d 1229, 1235 (11th Cir. 1988))). Significantly, appellees in the instant case have made no such claim. At no time have they argued there is any

theological purpose underlying the subject message or its dissemination via their AmVox system.

Furthermore, we reject appellees' assertion that the subject message does not promote "commercial transactions." On the contrary, the message unambiguously urges recipients to eschew purchasing P&G products in favor of Amway products. While economic motivation or reference to a specific brand name and products, when viewed in isolation, might not render a message commercial speech, we conclude that those factors taken together with the instant message's promotion of Amway products at the expense of P&G products support the characterization of the subject message as commercial speech. See Bolger, 463 U.S. at 67; Porous Media Corp., 173 F.3d at 1120-21 & n.8 (holding that a communication alleging health risks associated with a competitor's product was commercial speech under the Lanham Act, notwithstanding the fact that the communication concerned an issue of public importance); cf. U.S. West, Inc. v. FCC, 182 F.3d 1224, 1232-33 (10th Cir. 1999) (holding that a telecommunications company's use of speech "for the purpose of soliciting . . . customers to purchase more or different telecommunications services" was "commercial speech"). Nor are we faced with a situation in which the "theological" component of the subject message is "inextricably intertwined" with its commercial nature, as in the charitable contribution context. See, e.g., Riley v.

- 24 -

National Fed'n of the Blind, Inc., 487 U.S. 781, 796 (1988) (concluding that mandated disclosure of administrative costs was "inextricably intertwined" with noncommercial charitable solicitation and therefore subject to heightened First Amendment scrutiny); Village of Schaumberg v. Citizens for a Better Env't, 444 U.S. 620, 631-37 (1980) (same). In the absence of a genuine issue as to the subject message's "theological" content, and in light of the message's exhortation to eschew purchasing P&G's products in favor of Amway products, the conclusion that the subject message constitutes commercial speech for purposes of liability under the Lanham Act is unavoidable.

In classifying the patently fallacious message in the present case as commercial speech, we are acting in the spirit of the policy underlying the First Amendment protections accorded such speech, namely, to ensure that the "numerous private economic decisions" of our market economy are "in the aggregate, . . . intelligent and well informed." Virginia State Bd. of Pharmacy, 425 U.S. at 765. As in Ohralik, 436 U.S. at 457 (quoting Bates v. State Bar, 433 U.S. 350, 364 (1977)), the subject message "actually may disserve the individual and societal interest . . . in facilitating 'informed and reliable decisionmaking.'"

We conclude that the district court improvidently granted summary judgment to defendants-appellees on P&G's Lanham Act claim.[10]

## C

With regard to summary judgment on P&G's state law claims, under Utah law the subject message would be actionable as slander per se if "the defamatory words fall into one of four categories: (1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession or office; and (4) charge of the unchastity of a woman." Allred v. Cook, 590 P.2d 318, 320 (Utah 1979). Slander per se, unlike slander per quod, permits a finding of liability without the need to prove special harm. See id. On appeal, P&G challenges the district court's conclusion that the satanic rumor was "not incompatible with conducting a lawful business." P&G v. Haugen, No. 1:95 CV 0094 K, at 4 (D. Utah March 29, 1999) (order). It argues the representations that it "financially supports the Church of Satan and places the Devil's mark on its products are incompatible with P&G's

---

[10] We leave it to the district court to consider whether P&G has met those elements of a § 43(a) Lanham Act claim not before us in this appeal. See R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re Eric Peterson Constr. Co.), 951 F.2d 1175, 1182 (10th Cir. 1991) (remanding to the district court for a ruling on issues not addressed due to the court's dismissal on other grounds). Because our holding on the Lanham Act claim required us to reach an issue not timely raised by appellants, the parties should bear their own appellate costs for that claim. See Fed. R. App. P. 39(a).

lawful business of selling popular products for personal care and hygiene and for the home." (Appellants' Br. at 35.)

The false statements contained in the subject message are not the kind of allegations that constitute slander per se. As P&G notes, the question is whether the alleged behavior is <u>incompatible</u> with its business of selling household consumer goods, not whether the alleged behavior is <u>lawful</u>. Lawful, as used in the formulation of the tort, modifies "business, trade, profession, or office," thereby limiting the tort to statements made about "any merchant or trader whose business is a lawful one" and excluding statements about "a person engaged in an unlawful traffic or industry." Restatement (Second) of Torts § 573 comment (b). P&G's business is clearly lawful. However, allegations that it directs a percentage of its profits to the church of Satan are not incompatible with that business in the manner necessary to be actionable as slander per se.

> Disparaging words, to be actionable per se . . . must affect the plaintiff in some way that is peculiarly harmful to one engaged in [the plaintiff's] trade or profession. Disparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession.

<u>Id.</u> at comment (e). For example, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him." <u>Id.</u> at comment (c). Although offensive to many, an

- 27 -

allegation of Devil worship, like drunkenness, is "[d]isparagement of a general character, equally discreditable to all persons" and does not pertain to a quality that is peculiarly valuable in plaintiffs' professional activities of manufacturing and selling household consumer goods.[11]  Id. at comment (e).  We therefore hold that the district court properly granted summary judgment as to this claim.

## D

Vicarious liability may arise either from an employment or agency relationship.  See Glover v. Boy Scouts of Am., 923 P.2d 1383, 1385-86 (Utah 1996).  In the present case, the district court found P&G had failed to show that either kind of relationship existed between Amway and its distributors so as to give rise to a genuine issue of material fact regarding vicarious liability.  See P&G v. Haugen, No. 1:95 CV 0094 K, at 7-10 (D. Utah March 29, 1999) (order).

With regard to the distributors' employment status vis-à-vis Amway, the Utah Supreme Court has drawn a distinction between an employee and an independent contractor.  See Harry L. Young & Sons, Inc. v. Ashton, 538 P.2d 316, 318 (Utah 1975).  In general,

> [a]n employee is one who is hired and paid a salary, a wage, or at a fixed rate, to perform the employer's work as directed by the employer and who is subject to a comparatively high degree of

---

[11]  We note that our holding in this regard is peculiar to the Utah state slander per se cause of action and does not affect our holding in the Lanham Act context that the subject message implicated P&G's "commercial activities."

control in performing those duties. In contrast, an independent contractor is one who is engaged to do some particular project or piece of work, usually for a set total sum, who may do the job in his own way, subject to only minimal restrictions or controls and is responsible only for its satisfactory completion.

Id.; accord Western Casualty & Sur. Co. v. Marchant, 615 P.2d 423, 426 (Utah 1980); Tasters Ltd., Inc. v. Department of Employment Sec., 863 P.2d 12, 19 (Utah App. 1993). Factors a court may consider in determining the nature of the relationship include: "(1) whatever covenants or agreements exist concerning the right of direction and control over the employee, whether express or implied; (2) the right to hire and fire; (3) the method of payment, i.e., whether in wages or fees, as compared to payment for a complete job or project; and (4) the furnishing of the equipment." Ashton, 538 P.2d at 318; see also Glover, 923 P.2d at 1386 (applying the same analytical scheme in the vicarious liability context).

In the present case, although Amway sets parameters within which its distributors function, those distributors and Amway stand in relation to one another essentially as wholesaler and retailer and at the same time retailer and consumer. The record indicates that Amway sets certain rules, and provides certain resources like the AmVox voice message system (in the same way a wholesaler might provide factory warranty service and require a certain standard of behavior from its distributors), but Amway distributors, like retailers, act virtually autonomously in determining in what manner to sell (or consume)

Amway products. Based on the undisputed evidence in the record before us, we conclude Amway does not exercise a "comparatively high degree of control" over them. Ashton, 538 P.2d at 318. Therefore, the distributors are more analogous to independent contractors than to employees under Utah law. See id.; Stricker v. Industrial Comm'n, 188 P. 849, 851 (Utah 1920) (explaining that independent contractors utilize their own methods of achieving the contracted result).

The evidence also fails to create a genuine issue of material fact as to whether the distributors were Amway's agents. An agent is "a person authorized by another to act on his behalf and under his control." Vina v. Jefferson Ins. Co. of New York, 761 P.2d 581 (Utah Ct. App. 1988) (citations and internal quotations omitted). "The existence of an agency relationship is determined from all the facts and circumstances in the case." Id. (citation omitted).

> Under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority. Actual authority incorporates the concepts of express and implied authority. Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf. Implied authority, on the other hand, embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent. Implied authority is actual authority based upon the premise that whenever the performance of certain business is confided to an agent, such authority carries with it by implication authority to do collateral acts which are the natural and ordinary incidents of the main act or business authorized. This authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question.

Zions First Nat'l Bank v. Clark Clinic Corp., 762 P.2d 1090, 1094-95 (Utah 1988) (footnotes omitted).

In the present case, P&G cites no facts to show that Amway told the distributors to spread the subject message. The distributors' authority is therefore not "express" under Zions First National. Id. Nor did the distributors who spread the subject message act with implicit authority. Nothing in the record supports the conclusion that spreading the subject message, and indeed satanic rumors regarding P&G generally, was "natural[ly] and ordinar[ily]" incident to Amway's business.[12] Id.

## III

We turn now to P&G's remaining Utah state law claims, reviewing de novo the district court's dismissal for failure to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6). See Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Id. (citation and internal

---

[12] Because we hold Amway is not vicariously liable on the facts of this case for the acts of its distributors, the other instances cited by P&G—unconnected to acts of Haugen or the distributor appellees—of dissemination of allegations of collusion between P&G and the Evil One are not relevant to the disposition of the present case.

quotations omitted).  We consider first the Utah tortious interference with business relationships claim, and afterwards the Utah unfair competition claim.

**A**

Under the Utah Supreme Court's decision in Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 304 (Utah 1982), a defendant is liable for tortious interference with business relationships if the plaintiff proves "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."  The district court dismissed the tortious interference claim based on its conclusion that P&G had failed to meet its burden on the pleadings with regard to the first and third elements of the Isom test.  See P&G v. Haugen, No. 1:95-CV-0094-S, at 3-9 (D. Utah July 14, 1997) (Order); P&G v. Haugen, No. 1:95-CV-0094W, at 13-14 (D. Utah Dec. 3, 1996) (Order).

With regard to the first element of tortious interference, the text of the subject message itself at least raises an inference that Haugen and the distributor appellees were attempting to interfere with P&G's "existing or potential economic relations" with anti-satanic consumers and distributors.  Leigh Furniture & Carpet Co., 657 P.2d at 304.  Moreover, the court's reliance on St. Benedict's Development Co. v. St. Benedict's Hospital, 811 P.2d 194 (Utah 1991), for the proposition that P&G was required to plead with particularity existing or potential

business relationships with an identifiable class of third persons is erroneous. That case simply held the plaintiff's allegations that its tenants would not <u>renew</u> their leases given the pending availability of tenancies in the defendant's building were inadequate because failure to renew did not constitute a breach or impairment of an <u>existing</u> contract. <u>See id.</u> at 201. Moreover, to the extent Utah law establishes a heightened pleading standard for tortious interference claims, the form of pleading is a matter of federal procedure. <u>See</u> <u>Blazer v. Black</u>, 196 F.2d 139, 144 (10th Cir. 1952). Under the broader notice-pleading requirements of Fed. R. Civ. P. 8 and cases like <u>Cook v. Winfrey</u>, 141 F.3d 322, 327-28 (7th Cir. 1998), P&G adequately alleged that the satanic message caused consumers, distributors, and other customers to stop purchasing its products.

Those same allegations also adequately plead the third element of tortious interference: causation. <u>See</u> <u>Isom</u>, 657 P.2d at 304. Although in the instant case the allegations are certainly general, "general factual allegations of injury resulting from the defendant's conduct may suffice" at the pleading stage to state a claim for which relief can be granted. <u>Skryzypczak v. Kauger</u>, 92 F.3d 1050, 1053 (10th Cir. 1996) (citation and internal quotation omitted).

P&G's tortious interference claim therefore should have survived defendants-appellees' Rule 12(b)(6) motion.[13]

**B**

P&G admits in their brief that "the Utah Supreme Court has considered the tort of unfair competition primarily in the context of palming off and misappropriation of goodwill." (Appellants' Br. at 41.) Both "palming off" and "misappropriation of goodwill" involve situations in which a company attempts to profit from the reputation of its competitor by selling one of its own products as that of its competitor or misappropriating a trademark belonging to its competitor. See, e.g., Allen Prods. v. Glover, 414 P.2d 93, 95 (Utah 1966). That is not what occurred in the instant case, and it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court or, in the absence of Utah Supreme Court precedent, by the lower Utah courts. See Sellers v. Allstate Ins. Co., 82 F.3d 350, 352 (10th Cir. 1996) ("Our duty [as a federal court sitting in

---

[13] The fact that judgment was entered as to a similar claim between the parties in United States District Court for the Southern District of Texas after judgment was entered by the district court in the present case has no effect on our ability to resolve this appeal. See Priddy v. Edelman, 883 F.2d 438, 442 (6th Cir. 1989); Flood v. Harrington, 532 F.2d 1248, 1250 (9th Cir. 1976). The res judicata implications can be addressed on remand when there will be an opportunity to develop a record on the nature and factual bases for the dismissed claim in Texas and to compare those with the nature and factual basis for the claim in the instant case. See Northern Natural Gas Co. v. Grounds, 931 F.2d 678, 681-82 (10th Cir. 1991).

diversity jurisdiction] is . . . to ascertain and 'apply the most recent statement of state law by the state's highest court.'" (quoting <u>Wood v. Eli Lilly & Co.</u>, 38 F.3d 510, 513 (10th Cir. 1994))); <u>Taylor v. Phelan</u>, 9 F.3d 882, 887 (10th Cir. 1993) ("As a federal court, we are generally reticent to expand state law without clear guidance from [the state's] highest court . . . .").

## IV

The judgment of the district court is **AFFIRMED** as to all claims except the court's grant of summary judgment on P&G's Lanham Act claim and its dismissal of P&G's Utah tortious interference claim, as to which we **REVERSE** and **REMAND** for further proceedings in accordance with this opinion.