FILED
United States Court of Appeals
Tenth Circuit

April 27, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

DEVON ENERGY PRODUCTION
COMPANY, L.P.; DEVON
ENERGY CORPORATION,

      Plaintiffs - Appellants,

v.

UNITED STATES DEPARTMENT
OF THE INTERIOR,

      Defendant - Appellee.

No. 24-6132

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:20-CV-00053-D)**

_____

L. Poe Leggette, Baker & Hostetler LLP, Houston, Texas (Bailey A.
Bridges, Baker & Hostetler, Houston, Texas; Alexander K. Obrecht, Baker
& Hostetler LLP, Denver, Colorado; and Mark B. McDaniel, Devon Energy
Production Company, L.P., Oklahoma City, Oklahoma, with him on the
briefs), for Appellants.

John K. Adams (Adam R.F. Gustafson, Acting Assistant Attorney General,
and Michelle Melton, Attorney, Environment & Natural Resources
Division, on the brief), United States Department of Justice, Washington,
D.C., for Appellee.

_____

Before **HARTZ**, **TYMKOVICH**, and **BACHARACH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This appeal grew out of a dispute about royalties owed to the federal government for gas production.

The dispute itself had arisen from the federal government's lease of land to Devon Energy Production Co., L.P. The lease allowed Devon Energy to produce gas in exchange for royalties, which were subject to certain deductions. To ensure proper payment of the royalties, the federal government authorized state officials to audit Devon Energy's production of gas and related deductions. With that authority, state officials conducted an audit in 2009 and disallowed some of the deductions taken over a four-year period (2004–2008). Devon Energy objected to the state officials' conclusions, but a federal agency (the Office of Natural Resources Revenue) overruled those objections and ordered Devon Energy to either pay the amount in dispute ($2,841,264.58) or to supply greater support for the deductions.

Devon Energy sought judicial review, claiming in part that the agency had acted arbitrarily and capriciously. The district court affirmed the agency's decision. In our view, however, the agency acted arbitrarily and capriciously by failing to consider the effect of a prior settlement agreement.[1]

_____

[1]    Devon Energy also denied making repeated or systematic errors, argued that further proof was unnecessary to support the deductions, and

1.     **Calculation of royalties on federal leases for gas**

Royalties are calculated based on the value of the minerals extracted. *See* 30 U.S.C. § 223. The value is generally the amount that the lessee obtains when selling the gas in an arm's-length transaction.[2] 30 C.F.R. § 206.152–53. But the value can be reduced through the deduction of certain costs incurred in the production of gas. 30 C.F.R. § 206.151. Those deductions can include the costs of treating and transporting natural gas for resale. 30 C.F.R. §§ 206.151, 206.156–58. But a lessee can't deduct the cost of gathering or putting the gas in "marketable condition." 30 C.F.R. §§ 206.151 (gathering), 206.152(i) (putting the gas in marketable condition).

2.     **Devon Energy's leases**

This case involves Devon Energy's production of natural gas from two units in New Mexico: (1) the Northeast Blanco Unit and (2) the San Juan 32-9 Unit. Beneath those units lie two formations of natural gas: the Fruitland Coal and the Mesa Verde.

---

alleged a denial of due process from the agency's failure to provide a factual basis for the order. We need not consider these claims given our view that the agency acted arbitrarily and capriciously by failing to consider the settlement agreement.

[2]     The Secretary of the Interior enacts rules on how to calculate a mineral's value. *See* 30 U.S.C. § 189.

The Fruitland Coal formation lies under both units, and the Mesa Verde lies under the Northeast Blanco Unit. The Fruitland Coal formation includes coalbed methane, which ordinarily contains a high concentration of carbon dioxide. The excess carbon dioxide must ordinarily be removed to make the natural gas marketable. When the excess prevents sale, the lessee can't deduct the cost of removing the carbon dioxide. 30 C.F.R. §§ 206.151, 206.152(i). In contrast, the Mesa Verde formation generally includes conventional gas, which contains only a small fraction of carbon dioxide. But other impurities may require treatment before the natural gas can be sold.

**3.    De novo review under the arbitrary-and-capricious standard**

We conduct de novo review, applying the same standard that governed in district court. *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001). In district court, the issue was whether the agency had acted arbitrarily and capriciously in ordering further payments or additional support for the deductions. 5 U.S.C. § 706(2)(A). An order is *arbitrary and capricious* if it "fail[s] to consider an important aspect of the problem." *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 149 F.4th 1142, 1148 (10th Cir. 2025).

**4.    Error in the agency's failure to consider the settlement agreement**

The disagreement includes the amounts that Devon Energy paid to two companies (Enterprise Field Services and Williams Field Services) to

4

treat natural gas from the Fruitland Coal formation. Each company combined its charges, bundling some charges that were deductible (such as transportation of natural gas for sale) with some that weren't (such as removal of excessive carbon dioxide to make the gas marketable). Because each company bundled its charges, Devon Energy wouldn't ordinarily know how its costs were allocated.

But another Devon entity had encountered a similar problem when audited for royalties paid over a 2½ year period (May 1990 to December 1993). That Devon entity and the government disagreed on which costs were deductible, but resolved the disagreement by entering a settlement agreement.

When state officials raised a similar issue in the 2009 audit, Devon Energy responded that it was simply using the same formula set out in the settlement agreement. The agency said nothing about the settlement agreement and ordered Devon Energy to separate the charges or use another way to identify the deductible costs.

The district court excused the agency's failure to mention the settlement agreement, reasoning that it wouldn't have covered all of the disputed royalties. But the issue was whether the settlement agreement constituted an important part of the problem—not whether the agreement had covered all of the gas. *See* Part 3, above. In our view, the settlement

5

agreement constituted an important legal and factual part of the problem in calculating the deductible costs.

Legally, the settlement agreement controlled over regulations that would otherwise conflict. 30 C.F.R. § 206.150(b). And factually, the settlement agreement could affect a substantial part of the disputed royalties. For example, over 80% of the disputed royalties involved the coalbed methane in the Fruitland Coal formation. Appellants' App'x at 176. So if Devon Energy had properly relied on the settlement agreement to calculate treatment costs, the agency would apparently have miscalculated the amount due for over 80% of the gas production.

The district court appeared to assume that Devon Energy still needed to separate what it had paid for treatment. Devon Energy contends that it separated this cost by using the rate stated in the settlement agreement. The agency didn't address this contention when rejecting Devon Energy's objection to the audit. That omission involved a significant part of the calculation of deductible costs. The agency thus acted arbitrarily and capriciously in failing to consider an important aspect of Devon Energy's objection to the audit.

5.    **Harmlessness of the alleged error**

The government contends that this omission was harmless because the settlement agreement had involved a different Devon entity and had expired before the audit period. The district court didn't rely on

6

harmlessness, but we can consider alternative grounds to affirm[3] under certain circumstances. So we consider whether those circumstances exist here.[4]

### a.    Involvement of a different Devon entity

The government's first argument involves identification of the Devon entity that participated in the settlement agreement. Here the disputed royalties were owed by an entity named *Devon Energy Production Co., L.P.* But the settlement agreement involved a Devon entity named *Devon Energy Corporation (Nevada)*. Given the different names, the government argues that the party in this case (Devon Energy Production Co., L.P.) couldn't rely on the settlement agreement. In response, Devon Energy Production Co., L.P. insists that it is the same entity that had entered the settlement agreement, attributing the name change to a merger.[5]

---

[3]    Because the district court didn't rely on harmlessness, this argument involves an alternative basis to affirm. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273 (10th Cir. 2000).

[4]    "The Supreme Court's decision in *SEC v. Chenery Corporation* stands for the proposition that a reviewing court may not affirm an agency decision based on reasoning that the agency itself never considered in its administrative proceedings." *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 435 (10th Cir. 2011) (citing *SEC v. Chenery Corporation*, 318 U.S. 80, 87 (1943)). We need not address the effect of *Chenery Corporation* because we're reversing on other grounds.

[5]    Devon Energy also argues that the agency didn't present this argument in district court. We need not address this argument.

The agency never addressed the relationship of the Devon entities in the settlement agreement and this case. So Devon Energy had no reason to include the merger documents in the administrative record. But their absence from the administrative record prevents a meaningful evaluation of the parties' arguments about the alleged merger. Absent an adequate record for meaningful consideration of this issue, we can't rely on it as a basis to affirm. *See Ashby v. McKenna*, 331 F.3d 1148, 1151 (10th Cir. 2003) (stating that we can affirm on an alternative ground only when the record is sufficient to permit us to decide the legal issue).

### b.    Assumption of the settlement agreement

The government also argues that even if the name change had arisen from a merger, the surviving entity (Devon Energy Production Co., L.P.) might not have assumed the settlement agreement. Again, however, the record doesn't indicate whether the surviving entity obtained the rights and liabilities of Devon Energy Corporation (Nevada). Given the incomplete record as to those rights and liabilities, we can't affirm based on uncertainty about the right to rely on the settlement agreement. *See id.*

### c.    Expiration of the settlement agreement

The government adds that even if Devon Energy Production Co., L.P. were the same entity that had entered the settlement agreement and assumed its provisions, the agency's error would have been harmless because the provisions governing the treatment rate had expired before the

8

audit period. We can affirm on this basis only if the outcome were clear and indisputable. *See Roberts v. Barreras*, 484 F.3d 1236, 1244 (10th Cir. 2007) (stating that we can affirm on alternative grounds only when these grounds are "'indisputable' . . . and appear clearly in the record" (quoting *Colorado Property Acquisitions, Inc. v. United States*, 894 F.2d 1173, 1175 n.5 (10th Cir. 1990))).

But the duration of the treatment rate is debatable under the settlement agreement, which contains two provisions bearing on the deductibility of costs. The first provision appears in Exhibit B; there the parties set out rates for transportation and removal of carbon dioxide. *See* p. 5, above; p. 16, below. The second provision appears in the body of the settlement agreement, stating that some of the rates in Exhibit B would expire no later than 2000. (The period in dispute began four years later.) But the settlement agreement doesn't clearly say whether the treatment rates were subject to the expiration date.

Given the lack of clarity, Devon Energy insists that

- the agreed treatment rates never expired and

- Devon Energy has been applying those rates for many years.

The government and the dissent disagree with Devon Energy, though their explanations differ: The government argues that the rate for treatment would have expired no later than 2000, and the dissent suggests that the

9

settlement agreement might have covered only the cost of transportation without setting any rate for treatment.

The government's argument is plausible, but rests on ambiguous language in the settlement agreement: "The Department and Devon agree further that the rates identified in Exhibit 'B' hereto for transporting coalbed gas from the [Northeast Blanco Unit] and any other property that is subject to the agreements between [the Devon entity] and Burlington Resources Gathering, Inc., for the transportation and treatment of coalbed gas as of April 1, 1997, will continue until the original expiration date of the agreement between [the Devon entity] and Burlington, or until such earlier date if the rate charged under that agreement is modified, altered, or changed." Appellants' App'x at 273. This sentence contains four parts:

In one part, the sentence says that some of the Devon entity's agreed rates would end at a certain point.

In the second part, the sentence specifies which of those rates would end: the rates for transporting coalbed gas from the Northeast Blanco Unit and certain other "property."

The third part defines the *property* containing the coalbed gas: the property "that is subject to the agreements between [the Devon entity] and Burlington Resources Gathering, Inc., for the transportation and treatment of coalbed gas as of April 1, 1997." *Id.*

10

The fourth part ties the duration of the pertinent rate to the expiration of the Devon entity's agreement with Burlington Resources Gathering, Inc. and recognizes that the parties could modify the termination date.

But what was the pertinent rate subject to an expiration date? To answer, Devon Energy focuses on the third part of the sentence: "that is subject to the agreement between [the Devon entity] and Burlington Resources Gathering, Inc., for the transportation and treatment of coalbed gas as of April 1, 1997." Devon Energy interprets this clause as a clarification of the *property* that is subject to the settlement agreement. Under this interpretation, the settlement agreement could be rewritten this way, referring to the property as *defined*:

> The Department and Devon agree further that the rates identified in Exhibit "B" hereto for transporting coalbed gas from the [Northeast Blanco Unit] and other [defined] property ~~that is subject to the agreements between Devon and Burlington Resources Gathering, Inc., for the transportation and treatment of coalbed gas as of April 1, 1997,~~ will continue until the original expiration date of the agreement between Devon and Burlington, or until such earlier date if the rate charged under that agreement is modified, altered, or changed.

By defining the property involved, the settlement agreement could mean that the agreed rate for *transportation* would terminate without mentioning a termination date for the rate governing *treatment*. Without an expiration date for the treatment rate, it would continue indefinitely.

11

Granted, this isn't the only plausible interpretation. The parties could plausibly interpret the sentence to provide the termination date for all of the rates in Exhibit B (including the treatment rate). For this interpretation, the government points to two parts of Exhibit B in the settlement agreement.

First, this exhibit gives an example of how the Devon entity was to calculate deductions. That example provides a "Total Transportation Rate," which is the sum of the rates for transportation (which Devon Energy concedes expired) and treatment (which Devon Energy argues did not expire). Given this example, the parties might have intended to set the expiration for both rates (transportation and treatment) by referring to the combination of rates as *Transportation*:



Second, Exhibit B refers to "termination dates":

EXHIBIT B
CONTRACTS WITH BURLINGTON RESOURCES GATHERING, INC.

| Devon & B&N Contract # | Service | Property | Termination Date | Contract Rate | Transp. Rate | CO2 Rate |
|---|---|---|---|---|---|---|
| 30-0855 | Transportation, Dehydration, and Treating | NEBU - FC : | 8/31/2000 | | | |
| | | Pump Mesa | | .30 | .2222 | .0778 |
| | | Sims Mesa | | .30 | .2222 | .0778 |
| | | Middle Mesa | | .35 | .1722 | .0778 |
| | | SAN JUAN 32-9 (FC) Pump Canyon (Wells 201, 202,235) | | .30 | .2222 | .0778 |
| | (Deliveries in excess of 12,000 mcf/d) | SJ 32-9 and Other FC | | | | |
| | | SJ 32-9 & SJ 270 | | .30 | .2222 | .0778 |
| | | Arnaud A-1 | | .30 | .2222 | .0778 |
| | | Arnaud A-2 | | .30 | .2222 | .0778 |
| | | Arnaud A-3 | | .30 | .2222 | .0778 |
| | | Isabel A-1 | | .30 | .2222 | .0778 |
| | | Tank Min. B-1 | | .30 | .2222 | .0778 |
| 30-1165, 30-1166 | Transportation, Dehydration and Treating (Deliveries up to 12,000 mcf/d) | SJ 32-9 and Other FC | 12/10/2000 | | | |
| | | SJ 32-9 & SJ 270 | | .305 | .2272 | .0778 |
| | | Arnaud A-1 | | .305 | .2272 | .0778 |
| | | Arnaud A-2 | | .305 | .2272 | .0778 |
| | | Arnaud A-3 | | .305 | .2272 | .0778 |
| | | Isabel A-1 | | .305 | .2272 | .0778 |
| | | Tank Min. B-1 | | .305 | .2272 | .0778 |

The government interprets these entries as proof that all of the rates terminated. But these entries could be indicating the termination dates for the contracts with Burlington Resources.[6] And if the termination dates referred to the contracts themselves, the treatment rate would not necessarily have terminated.

---

[6]    In a footnote, the government asserts that there's evidence suggesting a modification of the contract in 2000. Even if the contract had been modified in 2000, however, the government doesn't explain why this modification would affect expiration of the treatment rate.

In both respects, Exhibit B is ambiguous. Given the ambiguities, we can't discount the possibility of a different outcome if the agency had considered the settlement agreement. That possibility prevents us from characterizing termination of the treatment rate as a clear and indisputable basis to affirm on alternative grounds. *Roberts v. Barreras*, 484 F.3d 1236, 1244 (10th Cir. 2007); *see* p. 9, above.[7]

The dissent takes a different approach, arguing that the parties either failed to set a treatment rate or included it as the *transportation rate* that would end at a defined time period. This argument involves two steps:

1.    The settlement agreement says that the transportation rate will "continue" until the year 2000 or earlier.

2.    If the treatment rate isn't included in the transportation rate, the settlement must not have even set a treatment rate.

The settlement agreement says in an exhibit that the treatment cost is 7.78 cents per thousand cubic feet.

---

[7]    Devon Energy also argues that

- it shouldn't have needed to identify the gas that was already marketable without treatment and

- the agency violated due process by failing to provide a factual basis for the order.

But we have already determined that the agency acted arbitrarily and capriciously by failing to consider the settlement agreement. So we don't need to address Devon Energy's other arguments for reversal.

MAY-28-98 17:10 From:OE/PSO                    2032913362            T-049 P.08/10 Job-231

**EXHIBIT B**
**CONTRACTS WITH BURLINGTON RESOURCES GATHERING, INC.**

| Devon & B&N Contract # | Service | Property | Termination Date | Contract Rate | Transp. Rate | CO2 Rate |
|---|---|---|---|---|---|---|
| 30-0855 | Transportation, Dehydration, and Treating | NEBU - FC | 8/31/2000 | | | |
| | | Pump Mesa | | .30 | .2222 | .0778 |
| | | Sims Mesa | | .30 | .2222 | .0778 |
| | | Middle Mesa | | .35 | .2722 | .0778 |
| | | SAN JUAN 32-9 (FC) Pump Canyon (Wells 201, 202, 235) | | .30 | .2222 | .0778 |
| | (Deliveries in excess of 12,000 mcf/d) | SJ 32-9 and Other FC | | | | |
| | | SJ 32-9 & SJ 270 | | 30 | .2222 | .0778 |
| | | Arnaud A-1 | | .30 | .2222 | .0778 |
| | | Arnaud A-2 | | 30 | .2222 | .0778 |
| | | Arnaud A-3 | | .30 | .2222 | .0778 |
| | | Isabel A-1 | | 30 | .2222 | .0778 |
| | | Tank Mtn. B-1 | | .30 | .2222 | .0778 |
| 30-1165, 30-1166 | Transportation, Dehydration and Treating (Deliveries up to 12,000 mcf/d) | SJ 32-9 and Other FC | 12/10/2000 | | | |
| | | SJ 32-9 & SJ 270 | | .305 | .2272 | .0778 |
| | | Arnaud A-1 | | .305 | .2272 | .0778 |
| | | Arnaud A-2 | | .305 | .2272 | .0778 |
| | | Arnaud A-3 | | .305 | .2272 | .0778 |
| | | Isabel A-1 | | .305 | .2272 | .0778 |
| | | Tank Mtn. B-1 | | .305 | .2272 | .0778 |

The dissent argues that this column just repeats the rate established in Devon's contract with Burlington rather than recognize a new agreement on the rate. Dissent at 2. But this argument conflicts with the government's own argument in district court. There the government argued that .0778 (7.78 cents per thousand cubic feet) was "the agreed cost of $CO_2$ removal under the . . . Settlement Agreement." Defendant United States Department of the Interior's Resp. to Plaintiff's Opening Br. at 25, *Devon Energy Production Co. v. U.S. Dep't of Interior*, No. CIV-20-53-D (W.D. Okla.

16

Aug. 17, 2020). Given the government's interpretation, all of the parties have interpreted the settlement agreement to establish an agreed rate for treatment (7.78 cents per thousand cubic feet) as well as for transportation. Given the parties' mutual interpretation, we don't regard the dissent's contrary interpretation as "clear and indisputable." *Roberts v. Barreras*, 484 F.3d 1236, 1244 (10th Cir. 2007); *see* p. 9, above.

Because the parties agree that the settlement agreement established a rate for treatment, the main question is when that rate ended. The settlement agreement doesn't address the termination of that rate unless it had been part of the *transportation rate*. And the dissent itself recognizes that the settlement agreement's reference to the transportation rate is ambiguous because it

- might have referred solely to transportation and

- might have referred to both transportation and treatment.

Dissent at 2 ("The majority concludes that what the rate 'for transporting coalbed gas' encompasses is ambiguous—and it is.").

We thus conclude that the agreed rate for treatment could have continued into the audit period. So the government's argument on harmlessness is not clear and indisputable.

6.    **Vacatur or remand**

When an agency's decision is arbitrary and capricious, we must determine the appropriate remedy. The parties disagree on that remedy:

17

Devon Energy urges us to vacate the agency's decision; the government urges a remand to the agency rather than vacatur.

To determine whether vacatur is the proper remedy, we consider two factors:

1. [T]he seriousness of the agency action's deficiencies (and thus the extent of doubt whether the agency chose correctly) and

2. [t]he disruptive consequences of an interim change that may itself be changed.

*W. Watersheds Project v. Haaland*, 69 F.4th 689, 722 (10th Cir. 2023) (quoting *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023)).

Application of these "factors requires a fact-intensive inquiry that is typically left to the discretion of the district court." *Dine Citizens Against Ruining Our Env't*, 59 F.4th at 1049. So we reverse and remand to the district court with instructions to determine the appropriate remedy. *Id.*

24-6132, *Devon Energy v. DOI*

**TYMKOVICH**, Circuit Judge, dissenting

The majority rejects an alternative basis to uphold the agency's decision: that the agency's failure to address the settlement agreement was harmless error because the agreement did not apply during the audit period. Because the settlement agreement, even if ambiguous, did not set treatment rates that continued through the relevant audit period, I would affirm the district court and uphold the agency's decision.

The settlement agreement did not govern the treatment rate for the period of the agency's audit. That is because the language of the agreement contemplates two options, neither of which sets the treatment rate in perpetuity: either the agreement did *not* set the treatment rates in the first place, or it set them and they expired alongside all other agreed-upon rates before the audit period.

The settlement agreement fixed certain rates—and fixed an expiration date for those rates that it set. No rate was set that would not expire. After setting the methodology for calculating the transportation allowance, the agreement set a transportation rate alongside the expiration of that rate:

> The [agency] and Devon agree further that the rates identified in Exhibit "B" hereto for transporting coalbed gas . . . *will continue until* the original expiration date of the agreement between Devon and Burlington, or until such earlier date if the rate charged under that agreement is modified, altered, or changed.

Appellants' App'x at 273 (emphasis added). The rate "for transporting coalbed gas," whatever it entails, is set because it "will *continue* until"— and that same rate expires

because it "will continue *until*" one of two triggers. *Id.* (emphasis added). The agreement's language intertwines the fixed rate and its expiration.

The majority asserts that in addition to this provision, the agreement set rates in another "provision" in Exhibit B—but Exhibit B contains no such provision, only an image of the contractual rates between Devon and Burlington. *Ante*, at 9, 14. The agreement set rates only through its explicit provision that the "rates identified in Exhibit 'B' hereto for transporting coalbed gas . . . will continue until" the earlier of two triggers. Appellants' App'x at 273. And whatever rates that provision set have indisputably expired under the triggers.

The majority concludes that what the rate "for transporting coalbed gas" encompasses is ambiguous—and it is. But that ambiguity is not relevant to the outcome of this case. Whatever that rate encompasses, it expired by one of the agreement's triggers before the audit period. The fixed rates "for transporting coalbed gas" could have referred to either the "Total Transportation Rate" described in Exhibit B as the sum of the transportation rate and the treatment rate, or it could have meant the transportation rate alone. *Id.* at 277. Regardless, when the settlement agreement set rates "for transporting coalbed gas," either (1) the transportation and treatment rate were both set, "continue[d] until expiration," and expired, or (2) the transportation rate alone was set.[1] *See id.* at 273. In other words, the treatment rates

---

[1] The majority argues that the government excluded the second possible interpretation by conceding that the agreement set treatment rates. If the government did forgo the second interpretation, the only permissible remaining interpretation is

2

listed in Exhibit B were either (1) settled and since expired, or (2) never agreed to. Any way you slice it, the treatment rates in Exhibit B did not apply during the audit period. The majority insists that there's a third option: the transportation and treatment rates were both set but only the transportation rate expired. But the rate-setting provision does not permit that interpretation—whatever rates it set have since expired by the provision's triggers. Because the treatment rates in the agreement did not apply at the time of the audit, the agency did not act arbitrarily by failing to discuss the agreement. I would affirm on this ground.

---

the first—that both treatment and transportation rates were *set and expired* at the agreement's triggers.